**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| UNITED STATES DEPARTMENT OF ENERGY, | | |
| | Plaintiff, | C.A. No. 26-220-JLH |
| v. | | |
| FRIEDRICH AIR CONDITIONING, LLC, | | |
| | Defendant. | |

**OPENING BRIEF IN SUPPORT OF FRIEDRICH AIR CONDITIONING, LLC'S
MOTION TO DISMISS**

*Of Counsel*:

Eugene Scalia
Jonathan C. Bond
Aaron Hauptman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com
JBond@gibsondunn.com
AHauptman@gibsondunn.com

Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Sara M. Metzler (#6509)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
metzler@rlf.com

Dated: March 25, 2026

*Attorneys for Defendant*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS .................................................................... 2

SUMMARY OF ARGUMENT ............................................................................................ 3

STATEMENT OF FACTS ................................................................................................... 5

      A.    Legal Background ..................................................................................... 5

      B.    Factual Background ................................................................................ 10

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ..................................................................................................................... 12

      I.    DOE Cannot Enforce The 2022 Rule's New Regulatory Framework Retroactively ......................................................................................... 13

           A.    Nothing Before DOE's 2022 Rule Changed The Status Of Friedrich's SPVUs ..................................................................... 14

           B.    DOE's Penalty Improperly Seeks To Apply The 2022 Rule Retroactively ......................................................................... 17

      II.    DOE Lacks Statutory Authority To Impose Any Penalties For Failures To Test ...................................................................................................... 18

CONCLUSION .................................................................................................................. 20

# TABLE OF CITATIONS

**Cases**                                                                                                   **Page(s)**

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)..................................................................................................14

*Conopco, Inc. v. Roll Int'l*,
    231 F.3d 82 (2d Cir. 2000)......................................................................................12

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)..................................................................................................13

*Gates & Fox Co. v. OSHA*,
    790 F.2d 154 (D.C. Cir. 1986)................................................................................14

*Gen. Elec. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995)................................................................................18

*Groves v. Modified Ret. Plan for Hourly Paid Emps. of Johns
    Manville Corp. & Subsidiaries*,
    803 F.2d 109 (3d Cir. 1986)....................................................................................19

*Gupta v. Wipro Ltd.*,
    749 F. App'x 94 (3d Cir. 2018) ..............................................................................12

*Hedges v. United States*,
    404 F.3d 744 (3d Cir. 2005)....................................................................................12

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)..................................................................................................13

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)..................................................................................................16

*Mator v. Wesco Dist., Inc.*,
    102 F.4th 172 (3d Cir. 2024) ..................................................................................12

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016)..............................................................................14, 15

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987).....................................................................................13

*Spellman v. Am. Barge Line Co.*,
    176 F.2d 716 (3d Cir. 1949).....................................................................................12

*Trinity Broad. of Fla., Inc. v. FCC*,
    211 F.3d 618 (D.C. Cir. 2000)................................................................................18

# TABLE OF CITATIONS
## (*continued*)

**Statutes**            **Page(s)**

Energy Independence And Security Act of 2007,
  Pub. L. No. 110-140, 121 Stat. 1492 ......7

Energy Policy and Conservation Act,
  Pub. L. No. 94-163, 89 Stat. 871 (1975)......1, 5

National Energy Conservation Policy Act,
  Pub. L. No. 95-619, 92 Stat. 3206 (1978)......5

5 U.S.C. § 553 ......10

42 U.S.C. § 6201 ......5

42 U.S.C. § 6291 ......1, 6, 8, 16

42 U.S.C. § 6292 ......6

42 U.S.C. § 6293 ......5, 10

42 U.S.C. § 6294 ......5

42 U.S.C. § 6295 ......5, 6

42 U.S.C. § 6296 ......5, 19

42 U.S.C. § 6302 ...... *passim*

42 U.S.C. § 6303 ...... *passim*

42 U.S.C. § 6311 ...... *passim*

42 U.S.C. § 6312 ......6

42 U.S.C. § 6313 ...... *passim*

42 U.S.C. § 6314 ......5, 10, 16

42 U.S.C. § 6315 ......5

42 U.S.C. § 6316 ......5, 11

**Regulations**

10 C.F.R. § 430.2 ......10

10 C.F.R. § 431.92 (2022) ......7, 15

10 C.F.R. § 431.92 ......10, 16, 17

**TABLE OF CITATIONS**
(*continued*)

**Regulations** *(continued)*                                                          **Page(s)**

74 Fed. Reg. 12,058 (Mar. 23, 2009) ...................................................................................7

76 Fed. Reg. 12,422 (Mar. 7, 2011) ...................................................................................18

79 Fed. Reg. 78,614 (Dec. 30, 2014) .........................................................................7, 8, 15

80 Fed. Reg. 57,438 (Sept. 23, 2015) .................................................................3, 8, 15, 18

87 Fed. Reg. 2490 (Jan. 14, 2022) .............................................................................. *passim*

87 Fed. Reg. 64,550 (Oct. 25, 2022) ................................................................................10

87 Fed. Reg. 75,144 (Dec. 7, 2022) ........................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................2

**Other Authorities**

*Authority to Impose Civ. Penalties for Violations of Codes of Fair Competition*,
   37 U.S. Op. Atty. Gen. 579 (1934) ............................................................................19

**INTRODUCTION**

In seeking to enforce an oppressive $57 million penalty against Friedrich Air Conditioning, LLC (Friedrich), the United States Department of Energy (DOE) exceeds the authority given to it by Congress, and the limits imposed by the Constitution, in three separate ways.  DOE's penalty order and complaint are premised on regulations it issued in December 2022 that purport to specify which air-conditioner and heat-pump models must be tested using certain energy-efficiency testing standards; the 2022 regulations required compliance by December 2023.  Friedrich maintains (and will show if the case proceeds) that, as an initial matter, the 2022 rule exceeds DOE's statutory authority.  Friedrich nevertheless came into full compliance by the December 2023 deadline through extraordinary efforts.  But second, DOE perversely seeks to punish Friedrich's good faith by imposing an eight-figure penalty for not complying with the new regulations in the *five years before they took effect*—from 2019 to 2023.  Bedrock constitutional and administrative-law principles bar an agency from imposing retroactive regulatory mandates and backward-looking penalties on parties that lacked fair notice, on grounds that contradict the agency's own regulations in force at the relevant time.  Third and finally, DOE does not have statutory authority to impose *any* penalties for failing to test units in accordance with regulatory standards—let alone under standards DOE had yet to announce.  Even assuming the truth of all of DOE's allegations, its attempt to endow itself with a new civil-penalty authority is legally foreclosed.

DOE attempts to elide all of this through a complaint that tells less than half the story at every turn.  The complaint claims that Friedrich failed to test its units as required, but it omits (as even its penalty order acknowledged) that Friedrich did test its units—just under different standards, for commercial products, which Friedrich and others in the industry have long understood to apply.  DOE also relies on the Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6291 *et seq.*, but leaves out that Congress amended the law in 2007 to make clear that units like Friedrich's

1

are subject to commercial-product standards.  The complaint mentions a 2014-2015 DOE rule-making where the agency vaguely asserted its contrary view; but it neglects to note that, facing forceful industry pushback, the agency at that time expressly deferred that issue until a *future* rulemaking—which DOE did not undertake until 2022.  The complaint relies on the resulting 2022 regulations in their codified form; but it never acknowledges that they took effect *after* the period for which it seeks penalties, that the rules that *were* in force contradict DOE's position, or DOE's statement that the 2022 rule was needed to bring clarity to "confusion" DOE itself had "compounded."  And the complaint invokes DOE's authority to assess civil penalties under 42 U.S.C. § 6303 for violations of § 6302, but papers over the problem that failing to test is *not* an enumerated violation under that provision and instead is a new civil-penalty authority invented by DOE itself.

The complaint's hide-the-ball pleading is consistent with DOE's failure to give regulated parties fair notice, but it cannot help DOE survive a motion to dismiss.  DOE cannot evade the full landscape of statutes and its own rulemakings by cherry-picking preferred passages and ignoring the rest.  Nor can DOE duck its own allegations in the very penalty order it seeks to enforce.  DOE's complaint on its face and its own rules show that it is attempting to enforce an unlawfully retroactive and statutorily unauthorized penalty.  Friedrich stands ready to defend the merits, but this Court's time should not be wasted on the merits of a penalty DOE lacks authority to impose.

**NATURE AND STAGE OF PROCEEDINGS**

DOE brought this suit to enforce a February 2024 civil penalty that it assessed against Friedrich, under 42 U.S.C. § 6303, for allegedly failing to test and certify certain combined air-conditioner/heat-pump units sold from 2019 to 2023 under purportedly applicable regulatory standards.  The Court "review[s] de novo the law and the facts" and ultimately may "enforc[e]," "modif[y]," or "se[t] aside" the penalty.  *Id.* § 6303(d)(3)(B).  Friedrich moves to dismiss DOE's suit under Federal Rule of Civil Procedure 12(b)(6).

2

## SUMMARY OF ARGUMENT

I.    The Court should dismiss DOE's civil-penalty suit because the agency seeks to apply its own regulations retroactively and impose punishment for conduct predating the regulations' compliance deadline, contrary to settled fair-notice requirements.  The Due Process Clause and basic tenets of administrative law bar an agency from imposing backward-looking penalties to enforce requirements of which the regulated party lacked fair notice.  DOE's suit on its face violates that fundamental principle by seeking penalties from Friedrich for purportedly failing to test its relevant units from January 2019 to December 2023 based on a rule DOE adopted in 2022, which substantially amended the existing rules and applied only from December 2023 forward.

A.    EPCA imposes separate energy-efficiency testing regimes for consumer and commercial products.  Since 2007, EPCA has expressly defined "single package vertical air conditioners" and "single package vertical heat pumps" (together, single-package vertical units, or SPVUs) as types of commercial products.  42 U.S.C. § 6311(22)-(23).  DOE has long asserted that in its view *some* SPVUs nevertheless are consumer products, despite the statute defining SPVUs as commercial products.  But until the 2022 rule, DOE's own regulations tracked the statutory SPVU definitions verbatim, and DOE had never defined *which* SPVUs it thought fell within a supposed atextual carveout.  When DOE advanced its general view in a 2014 proposed rule, industry resisted; DOE acknowledged that pushback and deferred the issue until a "separate rulemaking."  80 Fed. Reg. 57,438, 57,448 (Sept. 23, 2015).  DOE conducted that rulemaking in 2022, noting "confusion with the appropriate classification of" SPVUs that DOE itself may have "compounded."  87 Fed. Reg. 2490, 2495 (Jan. 14, 2022).  DOE adopted a regulation specifying which SPVUs count (in DOE's view) as consumer products even though they satisfy the statutory definitions of (commercial) SPVUs.  DOE's definition was based not on anything in the statute but (by its admission) on DOE's own survey of the market and review of product literature and turns

3

on technical criteria DOE devised (*e.g.*, weatherization and ventilation thresholds).  The 2022 rule applied by its terms to testing of products beginning December 4, 2023.

**B.**    DOE impermissibly seeks a civil penalty against Friedrich for failing to comply with the 2022 rule for the five years *before* that rule's compliance deadline.  The penalty order acknowledges that Friedrich tested and certified its units under the commercial-product standards applicable to SPVUs.  But DOE's complaint alleges that Friedrich's units were instead consumer products.  In doing so, the complaint expressly relies on the codified version of DOE's 2022 rule, which specified for the first time which SPVUs DOE thinks fall within the consumer regime.  DOE cannot impose backward-looking punishment for failing to comply with rules that did not yet exist. Having adopted the 2022 rule to amend its existing rules and clarify "confusion" DOE itself exacerbated, DOE cannot credibly claim now that Friedrich had the legally required fair notice.  As a matter of law, DOE's improper suit to enforce the penalty cannot succeed.  It should be dismissed.

**II.**    DOE's suit to enforce the civil penalty should be dismissed for the independent reason that the agency lacks statutory authority to impose any penalty—let alone a retroactive sanction based on new regulations—for manufacturers' purported failure to test.  As DOE has correctly recognized in other contexts, it lacks authority to issue regulations penalizing conduct for which the statute does not authorize civil penalties.  DOE here invoked 42 U.S.C. § 6303, which authorizes civil penalties for violations of § 6302.  But failing to test is found nowhere in § 6302's list of statutory violations.  Tellingly, certain other violations listed in § 6302 are related to testing, confirming that Congress intentionally omitted penalties for failing to test by itself.

DOE's complaint cobbles together a novel theory that a company's failure to test causes it to commit other violations of § 6302.  That is wrong and irrelevant because DOE penalized failure to test.  Although its order and complaint also assert a failure to certify units, that purported viola-

tion could not support even one-sixth of the $57 million penalty DOE imposed. And it plainly was not the predicate of DOE's penalty, which matches its failure-to-test theory to the dollar.

### STATEMENT OF FACTS

#### A.    Legal Background

***Statutory framework.*** Congress enacted EPCA in 1975 in part to "provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products." 42 U.S.C. § 6201(5). EPCA sets minimum energy-efficiency standards for the various products it addresses and authorizes the Secretary of Energy to amend those standards under certain circumstances. *Id.* §§ 6295, 6313; *see also* D.I. 1 ("Compl.") ¶ 21. EPCA also imposes procedures to test energy efficiency and requires DOE to consider whether to amend those test procedures at least every seven years. 42 U.S.C. §§ 6293, 6314. And it empowers DOE to promulgate rules regarding energy-efficiency labeling. *Id.* §§ 6294, 6315. Manufacturers must provide those labels and cooperate with the agencies' efforts to verify the energy-efficiency information they contain— including by providing sample products for testing or by allowing the government to observe the manufacturer's testing. *Id.* §§ 6296(b), 6316(a) (applying § 6296 to commercial products).

As relevant here, EPCA establishes two parallel energy-efficiency regimes. First, as originally enacted, EPCA established the Energy Conservation Program for Consumer Products Other Than Automobiles. Pub. L. No. 94-163, tit. III, Part B, 89 Stat. 871, 917-932 (1975) (codified at 42 U.S.C. §§ 6291-6309). Second, in 1978, Congress added a parallel program for "Industrial Equipment," *i.e.*, commercial products. *See* National Energy Conservation Policy Act, Pub. L. No. 95-619 § 441, 92 Stat. 3206, 3267-72 (codified at 42 U.S.C. §§ 6311-6317). EPCA specifies the respective scopes of the consumer and commercial regimes through detailed definitions.

The ***consumer-product regime*** applies to 19 enumerated categories of "covered products," such as "[t]elevision sets," "[k]itchen ranges," "[d]iswashers," and "[r]oom" and "[c]entral air

conditioners." 42 U.S.C. § 6292(a)(1)-(19). The statute then defines those categories. For example, "central air conditioners" are defined as units that are (1) "powered by single phase electric current"; (2) "air-cooled"; (3) "rated below 65,000 Btu per hour"; (4) "not contained within the same cabinet as a [certain type of] furnace"; and (5) "a heat pump or cooling unit only." *Id.* §§ 6291(21), 6292(a)(3). Section 6295 prescribes energy-efficiency standards for those categories. *E.g.*, *id.* § 6295(d) (central air conditioners). DOE "may classify" additional "type[s]" of "covered products" if they meet a general definition of "consumer product," *id.* § 6292(b)(1); *see id.* § 6292(a)(20)—which turns on whether the item is "of a type" that, "to any significant extent, is distributed in commerce for personal use or consumption by individuals," *id.* § 6291(1)(B).

The ***commercial-product regime*** applies to "covered equipment," defined as 11 specified "types of industrial equipment," such as "[c]ommercial refrigerators," "walk-in freezers," "[a]utomatic commercial ice makers," and various sizes of "commercial package air conditioning and heating equipment." 42 U.S.C. § 6311(1)(A)-(K). Section 6311 defines those types. For example, "commercial package air conditioning and heating equipment" means "air-cooled, water-cooled, evaporatively-cooled, or water source (not including ground water source) electrically operated, unitary central air conditioners and central air conditioning heat pumps for commercial application," and is classified as either "[s]mall," "[l]arge," or "[v]ery large" based on "cooling capacity." *Id.* § 6311(1)(B)-(D), (8). Section 6313 sets forth energy-efficiency standards that apply to the identified types of industrial equipment. *Id.* § 6313(a). DOE also "may, by rule, include" additional "type[s] of industrial equipment as covered equipment" if they meet the statute's definition of "industrial equipment" and other criteria are satisfied. *Id.* § 6312(b); *see id.* § 6311(2)(A).

In 2007, Congress amended EPCA to address the category of items at issue here: SPVUs, a kind of commercial-package air-conditioning and heating unit housed in a single, vertical pack-

6

age.  Energy Independence And Security Act of 2007, Pub. L. No. 110-140, § 314, 121 Stat. 1492, 1569-71.  Congress added SPVUs to the commercial regime by enacting definitions of SPVUs in § 6311 for "single package vertical air conditioner" and "single package vertical heat pump" and adding energy-efficiency standards for them in § 6313.  42 U.S.C. §§ 6311(22)-(23), 6313(a)(10).  (Section 6311 has two subsections labeled "(22)"; this brief refers to the second one.)  A "single package vertical air conditioner" is an "air-cooled commercial package air conditioning and heating equipment" that "is factory-assembled as a single package that—(i) has major components that are arranged vertically; (ii) is an encased combination of cooling and optional heating components; and (iii) is intended for exterior mounting on, adjacent interior to, or through an outside wall."  *Id.* § 6311(22).  A "single package vertical heat pump" is a single-package vertical air conditioner that "uses reverse cycle refrigeration as its primary heat source" and "may include secondary supplemental heating by means of electrical resistance, steam, hot water, or gas."  *Id.* § 6311(23).

In 2009, DOE amended its own regulations to define SPVUs in exactly the same way. 74 Fed. Reg. 12,058, 12,073 (Mar. 23, 2009).  DOE explained that the 2007 statute had "add[ed] definitions" of those "new classes of commercial package air conditioning and heating equipment" and "establish[ed] energy conservation standards" for them.  *Id.* at 12,061.  Those regulatory definitions of SPVUs continued to track the statute until 2022.  10 C.F.R. § 431.92 (2022).

***DOE's 2014-2015 rulemaking.***  Despite the 2007 statutory amendment that categorically classifies SPVUs as commercial products, DOE has long asserted that some units that meet EPCA's definitions of SPVUs are nevertheless *consumer* products.  In a 2014 proposed rule, which the complaint discusses (¶¶ 106-107), DOE said it was disinclined to adopt a new subtype of SPVUs (for "space-constrained applications"), a provision that various industry participants had advocated.  79 Fed. Reg. 78,614, 78,625 (Dec. 30, 2014).  DOE said that it had "tentatively con-

7

cluded that there was no need" for that new SPVU subtype because DOE believed "certain models" of SPVUs it would cover "[we]re being misclassified" as commercial products and should instead be classified and tested as consumer products (specifically, as "central air conditioners"). *Id.*

DOE sought public comment and received extensive input on that issue, including multiple comments from the industry sharply critical of DOE's legal position on the significance of the "statutory definition of SPVU." 80 Fed. Reg. 57,438, 57,448 (Sept. 23, 2015) (discussing comments from the Air Conditioning, Heating, and Refrigeration Institute (AHRI) and from Friedrich, General Electric, Lennox International, and others). In the 2015 final rule—which the complaint also cites (¶ 108)—DOE noted those comments and stated that "DOE will consider these comments and take appropriate action in a separate rulemaking." 80 Fed. Reg. at 57,448.

***DOE's 2022 rulemaking.*** That promised "separate rulemaking" occurred seven years later. In January 2022, DOE proposed at last to draw a dividing line—which it had posited in the abstract, but had never defined—between SPVUs DOE accepts as subject to the commercial regime and other units that meet the statutory definitions of SPVUs but that DOE nonetheless views as central air conditioners subject to the consumer-product regime. 87 Fed. Reg. 2490, 2493-2495 (Jan. 14, 2022). DOE acknowledged that its existing regulations "codified the statutory definitions" of SPVUs enacted in 2007, *id.* at 2493, which draw no such distinction and instead categorically treat SPVUs as commercial. And DOE admitted that, "[r]eading the [statutory] definitions of SPVUs and [central air conditioners] in isolation," all units that meet the statutory criteria in § 6311(22)-(23) "could be understood to be SPVUs, as opposed to [central air conditioners]." *Id.* at 2493-2494. But DOE asserted that some units that meet the statutory SPVU definitions should nonetheless be tested as consumer products because (in DOE's view) they also fit § 6291's definition of "central air conditioners" and its general definition of "consumer products." *Id.* at 2494.

8

DOE observed that "confusion" existed regarding "the appropriate classification" of SPVUs, which "may have been compounded by DOE's" own prior statements. *Id.* at 2495.

DOE accordingly proposed new regulatory definitions specifically "[t]o clarify the distinction between SPVUs as industrial equipment" (*i.e.*, commercial products) "and [central air conditioners] as covered consumer products." 87 Fed. Reg. at 2494. The dividing line drawn by the proposed regulatory definitions was not derived from interpreting EPCA's text. Instead, the definitions were explicitly based on a "review of the market" and "review of manufacturer literature" DOE had conducted that, in the agency's view, reflected which products are typically "marketed" to consumers. *Id.* DOE stated that it had "identified specific technical features" that in its view supported putting some SPVUs on the commercial side of the line and others on the consumer side, based on the uses and applications for which they were purportedly then being marketed. *Id.*

DOE again received multiple public comments from Friedrich and others critical of its proposal. 87 Fed. Reg. 75,144, 75,149-75,152 (Dec. 7, 2022). General Electric, for example, contested DOE's legal "authority" and "justification" "to redefine the SPVU product class" contrary to the statute's terms. *Id.* at 75,149. The industry association, AHRI, similarly objected that DOE was improperly "reclassifying" SPVUs as consumer products even though "SPVUs are classified as a type of commercial air conditioner under EPCA." *Id.* But DOE rejected those criticisms and pressed forward with its new regulatory definitions. *Id.* at 75,152.

The December 2022 final rule purports to exclude from the commercial-product category of SPVUs units with cooling capacity below a certain threshold unless they also have certain additional features. Namely, despite the statutory definitions of SPVUs, the rule amended the existing regulatory definitions to treat units that meet the statutory definitions but have cooling capacity below 65,000 Btu/hour as commercial SPVUs only if they *also* (1) are "weatherized" or (2) have

9

"optional ventilation provisions available" and can condition "at least 400 cubic feet" of air "per minute." 87 Fed. Reg. at 75,167-75,168 (adding new regulatory definitions in 10 C.F.R. § 431.92 of "Single-phase single package vertical air conditioner with cooling capacity less than 65,000 Btu/h" and "Single-phase single package vertical heat pump with cooling capacity less than 65,000 Btu/h," and amending existing regulatory definitions of SPVUs to incorporate those new limitations). In a parallel rulemaking, DOE revised its consumer-products regulations defining "central air conditioner or central heat pump," 10 C.F.R. § 430.2, to encompass the units the 2022 rule removed from commercial SPVUs. 87 Fed. Reg. 64,550, 64,586 (Oct. 25, 2022); Compl. ¶ 37.

As required by the Administrative Procedure Act (APA), 5 U.S.C. § 553(d), the December 2022 rule set its "effective date" 30 days after its publication in the Federal Register—January 6, 2023. 87 Fed. Reg. at 75,144. But it said "[t]he final rule changes will be mandatory for product testing starting December 4, 2023"—*i.e.*, 360 days later, the lead time EPCA requires for amended testing procedures. *Id.*; *see id.* at 75,147, 75,162; *see also* 42 U.S.C. §§ 6293(c)(2); 6314(d)(1).

## B.    Factual Background

This dispute concerns several SPVU models manufactured by Friedrich—its Vert-I-Pak line of products. Compl. ¶ 70. DOE's complaint presents a highly skewed portrait of Friedrich—founded in San Antonio in 1883, with substantial U.S. operations today—as a lone industry outlier that flouted the law. And it almost entirely omits relevant events that occurred between the 2022 rule's December 2022 publication and the December 2023 compliance deadline for testing—such as Friedrich's administrative request to extend the deadline (which DOE denied), *cf.* ¶ 116, and its successful but extraordinary efforts to meet the 2022 rule's deadline by redesigning its units from the ground up. Friedrich will address those inaccuracies and omissions, if necessary, in due course.

Suffice it to note that DOE's suit does *not* question Friedrich's compliance with the 2022 rule after the December 2023 deadline. DOE asserts only violations involving units manufactured

10

"[b]etween January 2019 and December 2023"—*before* the 2022 rule's deadline.  Compl. ¶ 70; *see* ¶¶ 96-97, 119, 126.  As set forth in the penalty order—which the complaint repeatedly invokes and DOE's suit seeks to enforce, ¶¶ 64-66, 101-102, 123-124, 128-129—during those years, Friedrich "test[ed]" its Vert-I-Pak "models in conformance with the" test procedures for SPVUs (commercial products).  Ex. A, ¶ 9.  DOE asserts that Friedrich should have tested and certified its units all along as central air conditioners (consumer products).  *Id.* ¶ 11; Compl. ¶¶ 119-120, 126-127.

On January 24, 2024, DOE issued Friedrich a Notice of Proposed Civil Penalty alleging that it failed to test and certify the Vert-I-Paks properly.  Ex. B; Compl. ¶ 62.  It invoked 42 U.S.C. § 6303(a), which authorizes DOE to seek civil penalties for "knowingly violat[ing]" § 6302.  Section 6302 enumerates various prohibited acts, including distributing unlabeled products and equipment, failing to "make reports or provide other information required to be supplied," failing to "comply with" EPCA's requirements to cooperate with government efforts to verify labels, and distributing products or equipment that do not comply with energy-efficiency standards.  42 U.S.C. § 6302; *see also id.* § 6316(a) (applying § 6302 to commercial products).  Each noncompliant unit, and "each day" of failing to report or certify, is a "separate violation."  *Id.* § 6303(a).

DOE proposed a penalty of $57,813,840.  Compl. ¶ 98; Ex. B, at 1.  DOE stated that the "[m]aximum possible assessment," for both the alleged failure to test and failure to certify, was $67,067,280, based on (1) "103,239 units distributed" (for failures to test) and (2) "9 basic models x 1,826 days" (for failure to certify), for a total of "119,763" violations.  Ex. B, at 1.  (That figure appears to reflect a transposition error; it should be 119,*673*, yielding a $67,0*16,8*80 maximum penalty.)  The $57,813,840 penalty DOE proposed equals the maximum failure-to-test penalty.  *Id.*

Once DOE proposes a penalty, a party may elect either administrative review within DOE or to have DOE assess the penalty and sue to enforce it in a federal court, which "review[s] de

11

novo the law and the facts" and may "enforc[e]," "modif[y]," or "se[t] aside" the penalty. 42 U.S.C. § 6303(d)(3)(B).  Friedrich elected the latter.  Compl. ¶¶ 63, 65-67.  On February 28, 2024, DOE issued a $57,813,840 penalty.  *Id.*  ¶¶ 64, 102; Ex. A.  DOE sued to enforce that penalty.

## STANDARD OF REVIEW

"In a Rule 12(b)(6) motion, the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs, and determining whether they state a claim as a matter of law." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  "Dismissal * * * is appropriate," even based on an affirmative defense, if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Gupta v. Wipro Ltd.*, 749 F. App'x 94, 96 (3d Cir. 2018) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).  In ruling on a motion to dismiss, "[c]ourts may * * * 'consider documents integral to or explicitly relied upon in the complaint or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *Mator v. Wesco Dist., Inc.*, 102 F.4th 172, 178 (3d Cir. 2024) (citation omitted).  And courts "may always take judicial notice of rules and regulations formally promulgated" by a federal agency. *Spellman v. Am. Barge Line Co.*, 176 F.2d 716, 720 (3d Cir. 1949).

## ARGUMENT

The $57 million civil penalty DOE seeks against Friedrich is wholly misconceived because Friedrich never misclassified its Vert-I-Pak units under EPCA—much less "knowingly," as DOE must prove to collect a penny.  42 U.S.C. § 6303(a).  As Friedrich will show if the suit proceeds, DOE's position in its 2022 rule and in its complaint is wrong on the merits several times over.  But the Court need not ever reach those merits issues because DOE's suit should not get out of the starting gate, even assuming every fact alleged in the complaint is true.  That is so for two reasons.

12

First, DOE's suit improperly seeks to enforce its 2022 regulation retroactively and impose punishment for the five-year period *before* that rule took effect. Friedrich undisputedly has fully complied with the 2022 rule since it became applicable in December 2023. DOE's suit exclusively concerns units sold from 2019 to 2023—before the 2022 rule was in force, when DOE's existing rules tracked the statute, and before anyone could have known what (non-statutory) line the agency would later draw. No agency can punish conduct taken before a regulated party had fair notice.

Second, DOE has no statutory authority under EPCA to punish a failure to test standing alone. As DOE has previously conceded, it can impose penalties only to the extent authorized by statute. The statute DOE invokes here, 42 U.S.C. § 6303, authorizes penalties for other conduct but *not* failures to test. Yet Count I of the complaint expressly seeks penalties for failure to test. Although Count II asserts a failure to certify, that alleged violation could not support the penalty amount DOE demands—which exactly matches DOE's calculation of the failure-to-test penalty.

## I.    DOE Cannot Enforce The 2022 Rule's New Regulatory Framework Retroactively

The penalty DOE seeks to enforce is facially unlawful because it seeks to punish conduct based on regulatory requirements that did not exist at the time and that contradict the rules then in force. Regulated entities could not possibly have anticipated duties that DOE had not yet decreed.

Agencies cannot lawfully impose punishment after the fact for failure to comply with regulations not in force at the time. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause." *Id.* Due process entitles regulated parties to "an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). That fair-notice requirement is also grounded in the APA. *See, e.g., Satellite Broad. Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987).

13

Agencies thus must "provide regulated parties 'fair warning of the conduct a regulation prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (quoting *Gates & Fox Co. v. OSHA*, 790 F.2d 154, 156 (D.C. Cir. 1986)). Agencies cannot "require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Id.* at 159. *A fortiori*, "bedrock due process principle[s]" and the APA forbid an agency from imposing a retroactive *penalty* on a party who lacked "fair notice" of what was required at the time. *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016), *reh'g granted*, No. 15-1177 (D.C. Cir. Feb. 16, 2017), *reinstated in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc); *see id.* at 48-49; *Gates & Fox*, 790 F.2d at 156. That simple, fundamental principle forecloses DOE's penalty here.

A.     **Nothing Before DOE's 2022 Rule Changed The Status Of Friedrich's SPVUs**

Classification of Friedrich's Vert-I-Pak units under EPCA should be straightforward. Friedrich tested them under the commercial standards for SPVUs, Ex. A, ¶ 9, which the statute expressly defines as a type of commercial product, 42 U.S.C. § 6311(22)-(23). Neither DOE's complaint nor its penalty order alleges that Friedrich's models do *not* satisfy those statutory definitions of SPVUs. That should be dispositive because, until the 2022 regulation, EPCA and DOE's own rules called for testing Friedrich's products at issue as commercial SPVUs, which Friedrich did. DOE's complaint cites no statute or pre-2022 regulation that calls that conclusion into doubt.

To be sure, DOE has long said that it believes *some* subset of units that satisfy the statutory definitions of commercial SPVUs nevertheless are properly classified as central air conditioners and so should be tested instead as consumer products. That position has no basis in EPCA's text, and it flouts the 2007 amendment that expressly deemed SPVUs commercial products by defining SPVUs as types of industrial equipment and prescribing energy-efficiency standards specific to them. 42 U.S.C. §§ 6311(22)-(23), 6313(a)(10). But critically for present purposes, until the 2022

14

rule, DOE's own rules at the time "codified" EPCA's definitions verbatim, as DOE admitted, 87 Fed. Reg. at 75,147; 10 C.F.R. 431.92 (2022). "[B]asic due process" and "Rule of Law 101" forbid penalizing past noncompliance with *new* rules. *PHH*, 839 F.3d at 48-49. Moreover, DOE never identified until the 2022 rule *which* units that meet the statutory and pre-2022 regulatory definitions of (commercial) SPVUs it nevertheless views as (consumer) central air conditioners.

DOE's complaint points to the 2014-2015 rulemaking (¶¶ 106-108), but the very filings it cites show that DOE expressly deferred the issue until the 2022 rule. The 2014 notice of proposed rulemaking, echoing an earlier DOE filing, Compl. ¶ 106, stated DOE's general view that some unspecified subset of units then being tested as SPVUs should be classified as central air conditioners. 79 Fed. Reg. at 78,625; *see* Compl. ¶ 107. But many comments DOE received from industry sharply questioned the legal and factual premises of DOE's position—including DOE's treatment of the "statutory definition of SPVU." 80 Fed. Reg. at 57,448. DOE acknowledged those comments in the 2015 final rule and, instead of purporting to settle the issue in that rulemaking, explicitly reserved it for future regulatory proceedings: "DOE will consider these comments and take appropriate action in a separate rulemaking." *Id.* Anyone reading that 2015 rule would understand that the issue was intentionally left open—just as anyone reading the statute would see that SPVUs were expressly mentioned by Congress and listed as commercial products.

DOE did not return to the issue until 2022, when it endeavored at last to amend its rules to draw the line that (in DOE's view) divides SPVUs properly classified as SPVUs from units that should be tested as central air conditioners despite satisfying EPCA's definitions of SPVUs. 87 Fed. Reg. at 2493-2495; 87 Fed. Reg. at 75,149-75,152. To its credit, DOE was candid then that its existing rules tracked the "statutory definitions." 87 Fed. Reg. at 75,147. "[C]onfusion" existed about the proper classification of SPVUs, DOE said, which the agency itself may have

15

"compounded."  87 Fed. Reg. at 2495.  The 2022 rule's aim in redefining SPVUs was "[t]o clarify the distinction" the agency believes to exist between "SPVUs as industrial equipment" and units that in DOE's view are "covered consumer products."  *Id.* at 2494; *see* 87 Fed. Reg. at 75,148. And, as required by EPCA, the 2022 rule's changes applied 360 days after the rule was published— December 4, 2023.  87 Fed. Reg. at 75,162; 42 U.S.C. § 6314(d)(1) (requiring 360-day lead time).

DOE's 2022 rule did not purport to derive that new dividing line from the statute.  The rule classifies SPVUs rated below 65,000 Btu/hour as commercial products only if they also have other particular features:  (1) "weatherization" or (2) ventilation with the ability to condition least 400 cubic feet of air per minute.  87 Fed. Reg. at 75,167-75,168 (10 C.F.R. § 431.92).  DOE did not glean, and industry could not have divined, those criteria from the statute.  Nothing in the statutory definitions of SPVUs, 42 U.S.C. § 6311(22)-(23), or central air conditioners, *id.* § 6291(21), says anything about weatherization or ventilation (let alone that specific quantitative threshold).  And although the definition of "central air conditioner" is limited to units "rated below 65,000 Btu per hour," *id.* § 6291(21)(C), that limitation could not have been the basis of the new regulatory definitions because EPCA also expressly covers as (commercial) SPVUs units rated "less than 65,000 Btu per hour," *id.* § 6313(a)(10)(A)(i)—as DOE admitted in the 2022 rule, 87 Fed. Reg. at 75,147.

Instead, DOE based its novel definitions on a "review of the market" and features it thought indicated units were "marketed for commercial applications."  87 Fed. Reg. at 2494-2495; *see* 87 Fed. Reg. at 75,149-75,152.  Friedrich disputes DOE's asserted authority to blue-pencil the statute with its own invented criteria.  After *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), neither statutory silence nor ambiguity gives DOE the power to do so.  (For this reason, DOE's professed "confusion" was the product of its own defiance of plain statutory language.) But the key point for present purposes is that, even if DOE had authority to classify as consumer

16

products units the statute defines as commercial products, the criteria DOE adopted were entirely the agency's creation—and entirely unknowable until the 2022 rule.

### B.    DOE's Penalty Improperly Seeks To Apply The 2022 Rule Retroactively

DOE's penalty and enforcement suit flout fair-notice principles by seeking to apply the 2022 rule retroactively to past conduct and to punish Friedrich for its testing in the five years before the rule took effect—a period when DOE's own regulations tracked the statute's definitions of (commercial) SPVUs in 42 U.S.C. § 6311(22)-(23).  The complaint does not confront the statutory definitions or DOE's own pre-2022 regulatory definitions at all.  Instead, DOE argues that Friedrich's units are not SPVUs, and instead are central air conditioners (consumer products), because they do not meet the *new* regulatory definitions of SPVUs DOE adopted for the first time in 2022.

The complaint claims that the "Friedrich Products" are consumer products because they are not "single-phase single-package vertical air conditioner with cooling capacity less than 65,000 Btu/h" or "single-phase single-package vertical heat pump with cooling capacity less than 65,000 Btu/h," "*as defined in* 10 C.F.R. § 431.92."  Compl. ¶ 78 (emphasis added); *see also* ¶¶ 37, 77. Those definitions in § 431.92 are the very ones the 2022 final rule adopted (and incorporated into the newly revised SPVU definitions) to distinguish commercial SPVUs from central air conditioners.  87 Fed. Reg. at 75,167-75,168.  Although the complaint never acknowledges it, the backward-looking penalty it seeks to enforce for units sold in 2019-2023 is directly premised on the dividing line DOE adopted in the 2022 rule, which became operative for testing only in December 2023.

The 2022 rule is essential to DOE's case for imposing any penalty.  Without it, DOE would lack any basis to disregard EPCA's definitions of SPVUs, which DOE does not deny Friedrich's units satisfy, and which DOE's own pre-2022 rules codified.  The 2022 rule is the only provision that (1) embodies DOE's position that *some* units that satisfy the statutory definitions of SPVUs are nevertheless consumer products and (2) specifies *which* units DOE believes are thus excluded.

17

DOE announced in 2015 that it would address that issue in a "separate rulemaking." 80 Fed. Reg. at 57,448. And it said in the 2022 rulemaking that a new rule was needed to address extant "confusion" (which DOE may have "compounded") by "clarify[ing] the distinction" DOE believes to exist. 87 Fed. Reg. at 2494-2495; *see* 87 Fed. Reg. at 75,148. DOE's assertion of "confusion" confirms that it "could not possibly have provided fair notice." *Gen. Elec. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995); *see, e.g.*, *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 624, 628-629 (D.C. Cir. 2000) (no "fair notice" where agency admitted parties "may well have been confused").

To be clear, DOE's claim that Friedrich misclassified its Vert-I-Pak units is wrong on the merits for multiple reasons, and Friedrich is fully prepared to litigate those merits issues. But the Court's and Friedrich's time and resources should not be consumed needlessly by litigation over the merits of a retroactive civil penalty that DOE cannot lawfully impose in any event.

## II.    DOE Lacks Statutory Authority To Impose Any Penalties For Failures To Test

DOE's penalty is facially unlawful for the independent reason that the agency lacks statutory authority to impose any sanction for a manufacturer's failure to test its product pursuant to DOE requirements. As DOE itself has long acknowledged, it "may only assess penalties for specified prohibited acts" enumerated in EPCA. 76 Fed. Reg. 12,422, 12,441 (Mar. 7, 2011). Failure to test is not one of those prohibited acts, so it cannot support penalties. And the penalty DOE imposed tracks its failure-to-test penalty theory to the dollar, so the whole assessed penalty fails.

DOE's assessed penalty and complaint are expressly premised on 42 U.S.C. § 6303(a), Compl. ¶ 4; Ex. A, ¶ 24, but that provision does not permit penalties for failures to test in isolation. Section 6303 authorizes penalties for "knowin[g] violation[s]" of § 6302. 42 U.S.C. § 6303(a). Section 6302, in turn, prohibits particular, enumerated activities: failing to label covered products as required by Section 6294, *id.* § 6302(a)(1)-(2); failing "to make reports or provide other information required to be supplied under this part," *id.* § 6302(a)(3); failing to comply with "an appli-

18

cable requirement of section 6296(a), (b)(2), (b)(3), or (b)(5)," *id.* § 6302(a)(4); and distributing products that violate substantive energy-conservation standards, *id.* § 6302(a)(5)-(6); *see id.* § 6302(a)(7)-(8) (prohibitions specific to incandescent lamps and water heaters). But nothing in § 6302 prohibits failing to *test* a product under EPCA, so that cannot trigger any § 6303 penalty.

That is especially clear given EPCA's express authorization of penalties for other activities that are *related* to testing, but not for a failure to test by itself. Section 6302 authorizes a penalty for failing to comply with "an applicable requirement of section 6296(a), (b)(2), (b)(3), or (b)(5)." 42 U.S.C. § 6302(a)(4). Section 6296(b)(3) requires manufacturers to "supply * * * covered products to any laboratory designated by" DOE upon request to "ascertai[n] whether a product" complies with § 6295's energy-efficiency standards. *Id.* § 6296(b)(3). And § 6296(b)(5) requires a manufacturer to "permit a representative designated by" DOE "to observe any testing required by" EPCA "and inspect the results." *Id.* § 6296(b)(5). Refusing to supply products for testing or to allow DOE to observe testing can trigger penalties. Failure to test alone cannot.

DOE's complaint invokes its own regulations as authority to seek civil penalties. Compl. ¶ 33. But "Congress will be understood to have authorized agencies to decide what conduct should be penalized only if the legislature has expressly granted that power." *Groves v. Modified Ret. Plan for Hourly Paid Emps. of Johns Manville Corp. & Subsidiaries*, 803 F.2d 109, 117 (3d Cir. 1986). That has long been the Executive's position. *Auth. to Impose Civ. Penalties for Violations of Codes of Fair Competition*, 37 U.S. Op. Atty. Gen. 579 (1934). EPCA grants no such power. And DOE itself, as noted, has recognized that it cannot impose penalties absent statutory authority.

The complaint also suggests in passing that failure to test indirectly violates EPCA—and implies that penalties are therefore authorized—because a failure to test will cause a manufacturer to violate *other* obligations. Compl. ¶¶ 54-56. Manufacturers, DOE says, must label and certify

19

products, and labeling them properly requires "following the applicable test procedure." ¶ 55; *see* ¶¶ 54, 56. But that daisy-chain reasoning fails. Even if a failure to test can result in other violations, it does not follow that failing to test is itself a violation and permits penalties. If DOE believes a company has violated other statutory requirements, it must try to seek penalties on that basis; it cannot simply equate failure to test with distinct acts that are prohibited. In all events, that theory could not support a penalty imposed that is facially based (like this one) on a failure to test.

This defect independently dooms DOE's penalty order and this suit to enforce it. Although the penalty order and complaint also allege that Friedrich failed to certify its products—based on the same theory that Friedrich should have classified its Vert-I-Pak units as consumer products— the penalty clearly is premised on the purported failure to test. The Notice of Proposed Civil Penalty asserted a maximum penalty of $67,067,280 for the alleged failures to test and to certify. Ex. B, at 1. But, as the Notice explains, penalties for failures to certify are computed differently: per day per product line, not per unit. The maximum penalty for failure to certify, according to the Notice's own numbers ("9 basic models x 1,826 days," *id.*), is $9,203,040, less than one-sixth of the final penalty. The maximum failure-to-test penalty, based on units allegedly sold (103,239, *see id.*), was $57,813,840—exactly the penalty DOE proposed and assessed. *Id.*; Ex. A, at 1.

DOE's suit should therefore be dismissed because it seeks to enforce a penalty premised on a purported violation that cannot support *any* civil penalties under the statute. At a minimum, Count I—which seeks to enforce the penalty for failure to test—should be dismissed.

## CONCLUSION

The Court should dismiss the complaint—or at minimum Count I—with prejudice.

*Of Counsel*:

Eugene Scalia
Jonathan C. Bond
Aaron Hauptman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com
JBond@gibsondunn.com
AHauptman@gibsondunn.com


Dated: March 25, 2026

*/s/ Jeffrey L. Moyer*
Raymond J. DiCamillo (#3188)
Jeffrey L. Moyer (#3309)
Sara M. Metzler (#6509)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
dicamillo@rlf.com
moyer@rlf.com
metzler@rlf.com


*Attorneys for Defendant*

21