**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| UNITED STATES DEPARTMENT OF ENERGY,<br><br>    Plaintiff,<br><br>        v.<br><br>FRIEDRICH AIR CONDITIONING, LLC.,<br><br><br>    Defendant. | No. 1:26-cv-00220-JLH |

## U.S. DEPARTMENT OF ENERGY'S BRIEF
## IN OPPOSITION TO FRIEDRICH'S RULE 12(B)(6) MOTION TO DISMISS

JONATHAN BRIGHTBILL
General Counsel
United States Department of Energy

LUCY LEE
Acting Assistant General Counsel

DAVID CASE
Deputy Assistant General Counsel

NICHOLAS D. GRAY
Trial Attorney

CHRISTINA STUDT
Trial Attorney

BENJAMIN L. WALLACE
United States Attorney
District of Delaware

DYLAN J. STEINBERG
Chief, Civil Division

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Dated: April 24, 2026

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................................1

II.     STATEMENT OF THE NATURE AND STAGE OF THE  PROCEEDINGS...................1

III.    SUMMARY OF ARGUMENT ..........................................................................................2

IV.     STATEMENT OF FACTS AND LEGAL BACKGROUND...............................................2

    A.   Overview of the Energy Policy and Conservation Act .............................................2

    B.   Requirements Related to Consumer Central Air Conditioners ..................................6

    C.   Industrial SPVUs and DOE's 2014–2015 Rulemakings ...........................................6

    D.   2022 Industrial SPVU and Related CAC Test Procedure Rulemakings ...................8

    E.   Friedrich Did Not Test or Certify Its Products as Consumer CACs ........................10

V.      LEGAL STANDARD........................................................................................................10

VI.     ARGUMENT ...................................................................................................................11

    A.   Friedrich Violated EPCA by Selling Consumer CACs Without the Required Testing and
       Certification ............................................................................................................12

       1. Under EPCA's Text and Structure, Friedrich's Models Are Consumer CACs ................12

       2. DOE Did Not Reclassify SPVUs as CACs in the December 2022 Rule ..........................15

    B.   DOE Has Statutory Authority to Impose Penalties for Failure to Test ...............................17

VII.    CONCLUSION..................................................................................................................20

i

# TABLE OF CITATIONS

Page(s)

**Cases**

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
   654 F.3d 462 (3d Cir. 2011) ........................................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................10

*Doe v. U.S. Dep't of Justice*,
   753 F.2d 1092 (D.C. Cir. 1985) ...................................................................................20

*Fed. Trade Comm'n v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ........................................................................................15

*Flora v. Cnty. of Luzerne*,
   776 F.3d 169 (3d Cir. 2015) ........................................................................................13

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ........................................................................................11

*Grier v. Klem*,
   591 F.3d 672 (3d Cir. 2010) ........................................................................................11

*Murphy v. Millennium Radio Grp. LLC*,
   650 F.3d 295 (3d Cir. 2011) ........................................................................................14

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ........................................................................................11

**Statutes**

42 U.S.C. § 6201(5) ............................................................................................................3

42 U.S.C. § 6291 ........................................................................................................passim

42 U.S.C. § 6292 ............................................................................................................4

42 U.S.C. § 6293 .................................................................................................... 5, 18, 19

42 U.S.C § 6294 ....................................................................................................... 5, 18

42 U.S.C. § 6295 ................................................................................................................................passim

42 U.S.C. § 6296 .......................................................................................................................................5, 18

42 U.S.C. § 6298 ...........................................................................................................................................19

42 U.S.C. § 6302 ................................................................................................................................passim

42 U.S.C. § 6303 ......................................................................................................................1, 10, 19, 20

42 U.S.C. § 6311 ................................................................................................................................passim

42 U.S.C. § 6312(a) ........................................................................................................................................3

Pub. L. No. 94-163 ...........................................................................................................................3, 4, 12

Pub. L. No. 95-619 .........................................................................................................................................3

Pub. L. No. 100-12 ..................................................................................................................................6, 12

Pub. L. No. 110-140 .....................................................................................................................................6

Pub. L. No 102-486 ......................................................................................................................................3

## Rules and Regulations

Fed. R. Civ. P. 54(c) ....................................................................................................................................20

10 C.F.R. § 429.102(a)(2) .................................................................................................................... 19, 20

10 C.F.R. § 429.12 ...........................................................................................................................................5

10 C.F.R. § 429.71(c) ....................................................................................................................................18

10 C.F.R. § 430 ...............................................................................................................................5, 6, 12, 14

10 C.F.R. § 430.32 .................................................................................................................................4, 6, 12

10 C.F.R. § 431.92 .........................................................................................................................................16

10 C.F.R. § 431.97 ...........................................................................................................................................9

16 C.F.R. § 305 ................................................................................................................................................5

16 C.F.R. § 305.20 ...........................................................................................................................................5

**Other Authorities**

69 Fed. Reg. 50,997 ........................................................................................................... 6, 12

69 Fed. Reg. 50,998 ........................................................................................................... 6, 12

69 Fed. Reg. 51,000 ........................................................................................................... 6, 12

79 Fed. Reg. 20,114 ................................................................................................................ 7

79 Fed. Reg. 20,122 .......................................................................................................... 7, 15

79 Fed. Reg. 20,123 .......................................................................................................... 7, 15

79 Fed. Reg. 78,614 ................................................................................................................ 8

79 Fed. Reg. 78,626 .......................................................................................................... 8, 15

79 Fed. Reg. 78,627 .......................................................................................................... 8, 15

80 Fed. Reg. 57,438 ................................................................................................................ 8

80 Fed. Reg. 57,448 ................................................................................................................ 8

80 Fed. Reg. 57,550 ................................................................................................................ 8

80 Fed. Reg. 57,551 ................................................................................................................ 8

87 Fed. Reg. 2494.................................................................................................................... 9

87 Fed. Reg. 64,550 ............................................................................................................... 9

87 Fed. Reg. 64,586 ............................................................................................................... 9

87 Fed. Reg. 74,144 ............................................................................................................... 9

87 Fed. Reg. 74,148 ............................................................................................................... 9

87 Fed. Reg. 74,167 ............................................................................................................... 9

87 Fed. Reg. 74,168 ............................................................................................................... 9

## I.    INTRODUCTION

The United States Department of Energy ("DOE") pleads a straightforward case. It is based on the plain text of the Energy Policy and Conservation Act ("EPCA"). Since 1987, Congress has defined in EPCA an appliance with the technical elements now codified at 42 U.S.C. § 6291(21) as a "central air conditioner" ("CAC"). DOE pleads that products sold by Defendant Friedrich Air Conditioning, LLC ("Friedrich") from 2019 through 2023 meet those statutory elements. D.I. 1 ¶¶ 72–76. DOE also pleads facts establishing that Friedrich's products were "consumer product[s]." 42 U.S.C. § 6291(1). The products were "a type which is distributed in commerce to a significant extent for personal use or consumption by an individual." D.I. 1 ¶¶ 82–87. And Friedrich's motion concedes—just as the Complaint pleads, D.I. 1 ¶¶ 91–92—that Friedrich did not test or certify compliance with the federal efficiency standards applicable to a "central air conditioner." Because DOE's claims are grounded in the statutory text, Friedrich's motion to dismiss should be denied.

## II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

This is an action brought by DOE pursuant to 42 U.S.C. § 6303(d)(3)(B). It seeks to enforce an order imposing civil penalties against Friedrich for violating 42 U.S.C. § 6302(a). Friedrich: [1] failed to test various models of consumer CACs[1] in accordance with the standard established for such consumer products and permit agency access to such test data; and [2] failed to make required certification reports to DOE. Making reports that covered products are tested in accordance with procedures for consumer CACs is required by both EPCA and DOE's implementing regulations. For these violations, DOE assessed a civil penalty against Friedrich in accordance with the statutory procedures in EPCA. Friedrich refused to pay.

---

[1] For simplicity, this brief generally uses "CACs" to reference both a "central air conditioner" and "heat pump," as appropriate for a particular model. Heat pump is similarly defined with corresponding technical elements as those of a CAC. 42 U.S.C. § 6291(24).

1

### III.    SUMMARY OF ARGUMENT

1.      The Complaint pleads straightforward violations based on EPCA's plain text. Friedrich's Rule 12(b)(6) motion is, however, premised on a "Due Process" violation.  Friedrich asserts its past "full compliance" with certain inapplicable law and regulations, its "good faith" conduct, and what "the industry ha[s] long understood" various standards to be.  D.I. 6 at 1.  These and other predicate facts to its affirmative defense are disputed.  This cannot be resolved on a motion to dismiss.

2.      Friedrich's contrived narrative of government mistreatment is also premised on ignoring the plain text of EPCA.  Its reading ignores the definition of "central air conditioner," 42 U.S.C. § 6291(21); ignores the definitions of "consumer product" and "covered product," *id.* § 6291(1), (2); ignores the definition of "industrial equipment," *id.* § 6311(2)(A)(iii); and ignores the definition of "commercial package air conditioning and heating equipment," *id.* § 6311(8)(A).  Friedrich's motion is based on interpreting the meaning of an industrial "single package vertical air conditioner" or "heat pump," *id.* § 6311(22), (23), in isolation from the rest of EPCA's statutory provisions and context. This violates fundamental canons of statutory construction.

3.      DOE has clear statutory authority to require a manufacturer to conduct product testing and then to enforce those requirements as part of EPCA's efficiency standards.  Correct product testing is essential to both a manufacturer's "reports" to DOE and its products' "conformity with an applicable energy conservations standard."  *Id.* § 6302(a)(3), (5).  Friedrich does not dispute that it failed to use consumer test procedures.  Friedrich thus realized hundreds of millions of dollars in illegal revenue from sales of products that violated EPCA.  Regardless, Friedrich's arguments for reducing the penalty assessed also rest on disputed facts and thus must also be rejected on a Rule 12(b)(6) motion.

### IV.    STATEMENT OF FACTS AND LEGAL BACKGROUND

**A.  Overview of the Energy Policy and Conservation Act**

2

During the 1970s oil crisis, when up to 15% of U.S. electricity came from petroleum,[2] Congress established a program to improve the energy efficiency of certain consumer products.  42 U.S.C. § 6201(5).  First passed in 1975, statutory section 321 established the "Energy Conservation Program for Consumer Products Other Than Automobiles."  Pub. L. No. 94-163, 89 Stat. 917–18 (1975).  Three years later, Congress added a new part to direct DOE to classify equipment to promote "Energy Efficiency of Industrial Equipment."  National Energy Conservation Policy Act of 1978 ("NECPA"), Pub. L. No. 95-619, 92 Stat. 3206 (1978); *see also* 42 U.S.C. § 6312(a).[3]  From the inception of the "industrial" efficiency programs, Congress defined "[t]he term 'industrial equipment' to mean any article . . . (iii) *which is not a 'covered product'* as defined in section 321(a)(2)"[4] of the consumer products program established in 1975.  NECPA § 441, 92 Stat. at 3267 (inserting new section 340(2)(A)(iii)) (emphasis added).  Congress thus defined "industrial equipment" to exclude any consumer "covered product."  *Id.*  By defining "industrial equipment" to "not" be "a 'covered product'" listed in the consumer part of EPCA, Congress made the definitions *mutually exclusive*, with the definition of "covered product" (and thereby application of the consumer efficiency standards) controlling between the two.

The EPCA regime for covered products involves five key aspects: coverage, standards, test procedures, labeling, and enforcement.

---

[2]    https://www.eia.gov/energyexplained/electricity/electricity-in-the-us-generation-capacity-and-sales.php (last accessed April 23, 2026); https://www.eia.gov/todayinenergy/detail.php?id=31232 (last accessed April 23, 2026).

[3] For editorial reasons, upon codification, the consumer products program was redesignated Part A, and the industrial equipment program Part A-1.  These provisions are codified, respectively, at 42 U.S.C. §§ 6291–6309 (consumer products), and 6311–6317 (industrial equipment).

[4] In 1992 Congress removed the subsection "(a)" designation from section 321, 42 U.S.C. § 6291, but did not remove the "(a)" from the cross-reference in section 6311(2)(A)(iii).  *See* Energy Policy Act of 1992, Pub. L. No 102-486, § 123(b)(1), 106 Stat. 2776, 2817.

3

**Coverage**.  In general, Congress designates which appliances may be subject to EPCA's requirements by identifying those appliances and often establishing specified definitions.  *See generally* 42 U.S.C. §§ 6291, 6292, 6311.  Congress has included consumer CACs as a covered consumer products since the original enactment of EPCA in 1975.  *See* Pub. L. No. 94-163, 89 Stat. 918 (codified at 42 U.S.C. § 6292(a)(3)).  Over the years, Congress amended EPCA to expand this range of consumer products.  In its amended form, EPCA sets requirements for a wide range of consumer products, from central air conditioners and water heaters to battery chargers, *e.g.* 42 U.S.C. § 6295(d), (e), (u), as well as for industrial equipment, ranging from electric motors to "commercial package air conditioning and heating equipment." *E.g.*, *id.* § 6313(a)(9), (b).  Congress also granted the Secretary of Energy authority to expand the list of covered products and equipment.  *Id.* §§ 6292(b), 6312(b).

**Standards**.  Energy conservation standards for covered products typically set minimum efficiency thresholds or maximum rates of energy use.[5]  Congress may amend those standards itself, but also charges DOE with periodically reviewing and, as appropriate, revising them.[6]  For example, in 2019, the minimum heating efficiency of a space constrained CAC heat pump was 7.4 HSPF,[7] and the minimum cooling efficiency of a space constrained CAC or heat pump was 12 SEER.[8]

**Test Procedures**.  The standards rely on test procedures for each product.  These serve two purposes: [1] to measure covered products' energy performance accurately and consistently for determining compliance with applicable energy conservation thresholds or rates; and [2] to support

---

[5] *E.g.,* 42 U.S.C. §§ 6291(5), 6295(d); 10 C.F.R. § 430.32(c) (2019).

[6] 42 U.S.C. §§ 6295(m), 6313(a)(6).

[7] The heating seasonal performance factor ("HSPF") is based on testing under the CAC test procedure.  This was a measure of CAC heating efficiency between 2015 and 2022.  *E.g.,* 10 C.F.R. § 430.32(c)(1) (2019).

[8] The seasonal energy efficiency ratio ("SEER") is based on testing under the CAC test procedure.  This was a measure of cooling efficiency between 2015 and 2022.  *E.g.,* 10 C.F.R. § 430.32(c)(1) (2019).

representations about energy performance, including mandatory labels.[9]  For example, the HSPF (heating) test procedure for a CAC manufactured in 2019 required a manufacturer to operate test units under specific conditions, to measure and record values such as the energy consumed, and then to determine the model's efficiency and compliance by applying regulatory calculations to these values. 10 C.F.R. pt. 430, subpt. B, appendix M (2019).  In other words, accurate testing with the correct test procedure is integral and necessary for any manufacturer to establish conformity with an energy conservation standard.  42 U.S.C. §§ 6295(s), 6302(a)(5).

**Labeling**.  Mandatory labels, notably Energy Guides, inform consumers' purchasing decisions.[10]  The Federal Trade Commission ("FTC") provides rules for labels, including those for CACs, requiring information developed from testing under DOE's test procedures.[11]

**Enforcement**.  DOE enforces EPCA requirements through a compliance program that requires each manufacturer to report the energy performance of each basic model based on testing under the applicable federal test procedure.  42 U.S.C. § 6296; 10 C.F.R. § 429.12(a).  In these reports, manufacturers must certify to DOE that each basic model complies with applicable energy conservation standards and report selected data, before distribution in commerce and annually thereafter.  D.I. 1 ¶¶ 22, 28; 42 U.S.C. § 6302(a)(3); 10 C.F.R. § 429.12(a), (d) (2019).  For each category of product or equipment, DOE provides a template for manufacturers to complete with information identifying their models and detailing the energy performance of each and then submit online to DOE.[12]

---

[9] 42 U.S.C. §§ 6293(c) (prohibiting certain representations unless such product has been tested in accordance with applicable test procedures), 6294(c)(1)(A) (labels must disclose the estimated annual cost "determined in accordance with test procedures prescribed under section 6293"), 6295(s); 6296(b) (manufacturers must provide the data underlying the label and must keep the data on file for a certain period), 6302(a)(1).

[10] 42 U.S.C. §§ 6294; 6302(a)(1); 16 C.F.R. pt. 305, appendix L (example of Energy Guide).

[11] 42 U.S.C § 6294(c)(1)(A); 16 C.F.R. § 305.20 (2009) (labeling rule for CACs).

[12] 10 C.F.R. § 429.12(b), (c), (h); https://www.regulations.doe.gov/ccms/templates (last accessed Apr. 23, 2026).

## B. Requirements Related to Consumer Central Air Conditioners

Congress generally designated central air conditioners used by consumers as covered products in 1975.  D.I. 1 ¶ 34.  In 1987, Congress specifically defined a consumer CAC as:

> a product, other than a packaged terminal air conditioner, which— (A) is powered by single phase electric current, (B) is air-cooled, (C) is rated below 65,000 Btu per hour, (D) is not contained within the same cabinet as a furnace the rated capacity of which is above 225,000 Btu per hour; and (E) is a heat pump or a cooling only unit.

Pub. L. No. 100-12, § 2, 101 Stat. 103–04 (codified at 42 U.S.C. § 6291(21)).

As with other products, the requirements for different varieties of CACs evolved over time to reflect the array of products on the market.  In 1987, Congress established energy conservation standards for "single-package" CACs.[13]  DOE incorporated those standards into regulations in 1989.  D.I. 1 ¶¶ 42–43.  By 2004, DOE recognized that manufacturers were selling a subset of CAC models designed to have a smaller physical footprint.  These involved a tradeoff in energy efficiency due to increased costs and limits in cooling performance associated with size constraints.  DOE accordingly set distinct standards for "space-constrained" consumer CACs.[14]  Over time, DOE also revised the test procedure applicable to such CACs.  D.I. 1 ¶¶ 46–47, 49.

## C. Industrial SPVUs and DOE's 2014–2015 Rulemakings

Congress amended EPCA again in 2007.  This added to the industrial equipment part of EPCA the definitions and standards for industrial "single-package vertical air conditioners" and "heat pumps"[15] (collectively, "SPVUs").[16]  By defining industrial SPVUs as a form of "commercial package

---

[13] A single-package unit has all major assemblies enclosed in one cabinet. D.I. 1 ¶ 41.

[14] 10 C.F.R. §§ 430.2, 430.32(c) (2005); 69 Fed. Reg. 50,997, 50,998, 51,000 (Aug. 17, 2004) (defining space-constrained products as those meeting various criteria, including limits on exterior dimensions or overall displacement).

[15] In rulemaking preambles, DOE refers to single-package virtual *units*, "SPVUs," as a shorthand for single-package vertical air conditioners and heat pumps collectively, as do the party briefs.

[16] Pub. L. No. 110-140, 121 Stat. 1569–71 (2007), codified at 42 U.S.C. § 6311(22), (23).  Due to a
(continued)

6

air conditioning and heating equipment," 42 U.S.C. § 6311(22), (23), Congress established this equipment as a subset of "commercial package air conditioning and heating equipment," already defined at 42 U.S.C. § 6311(8).  Over a decade earlier, Congress had defined "commercial package air conditioning and heating equipment" as "industrial equipment" *only* if it is "of a type" "which is not a 'covered product' as defined" in the Consumer Products part of EPCA.  42 U.S.C. § 6311(2)(A)(iii), (B).  In short, consistent with the decades-old structure of EPCA, in the 2007 amendments, Congress defined and set standards for industrial SPVUs in § 6311(22), (23) such that any equipment that might superficially be within the scope of that industrial definition is nevertheless carved out and subject to regulation as a "consumer product" when such equipment is "of a type . . . which, to any significant extent, is distributed in commerce for personal use or consumption by individuals."  42 U.S.C. § 6291(1)(B).

In 2014, DOE proposed amending the EPCA regulations applicable to industrial SPVUs and other industrial heating equipment.  As part of those rulemakings, DOE addressed a decision by an industry association to recognize for *its* purposes a separate equipment class of small size-limited SPVUs.  DOE declined to follow that approach because it was incompatible with EPCA's text and structure.  In a 2014 Federal Register publication, DOE explained this rationale for not following the association.  79 Fed. Reg. 20,114, 20,122-23 (Apr. 11, 2014) ("2014 NODA").  DOE explained how EPCA's text and longstanding structure applied to these so-called space-constrained SPVUs.  DOE thereby reminded all manufacturers, including Friedrich, that the appropriate classification under EPCA for any product meeting the definition for a consumer CAC was as a CAC—not as an industrial SPVU.  DOE "determined that, based on the available product literature, as well as the governing definitions in EPCA, *certain units currently listed by manufacturers as SPVUs are being misclassified and are appropriately classified as central air conditioners* (and in most cases as space-constrained central air

---

drafting error, there are two subparagraphs labeled (22) in section 6311 of Title 42 of the U.S. Code; the relevant paragraph is the second one.

conditioners)." *Id.* at 20,123 (emphasis added).  DOE explained that, based on EPCA's text and structure, "consumer products and industrial equipment are *mutually exclusive* categories," and that a model can be considered industrial equipment *only if "it does not fit the definition of 'consumer product.'"  Id.* at 20,122 (emphasis added).  DOE further noted that, even if certain products met the technical parameters of industrial SPVUs, "DOE reviewed the characteristics of these products and concluded that they would also meet the definition of a 'central air conditioner.'"  *Id.*  "Because such units meet the definition for a 'consumer product' under 42 U.S.C. 6291(1), they cannot meet the definition of commercial 'industrial equipment' under 42 U.S.C. 6311(2)."  *Id.* at 20,123.

Later in 2014, DOE responded to manufacturer comments asking DOE to establish a class of size-limited models within industrial SPVUs.  DOE declined to do so.  DOE "maintain[ed] the position on space-constrained units that it outlined in the April 2014 NODA . . . given that certain units currently listed by manufacturers as SPVUs . . . are being misclassified and are appropriately classified as central air conditioners (in most cases, space-constrained central air conditioners)."  79 Fed. Reg. 78,614, 78,627 (Dec. 30, 2014).  DOE further explained, "these basic models are already covered products as space-constrained central air conditioners," and that "DOE believes the space-constrained products are properly classified . . . as central air conditioners . . . ."  *Id.* at 78,626.  In the final rule issued in 2015, DOE acknowledged further comments on the topic but did not modify its position.  DOE did state it would seek to address certain industry concerns regarding size-limited SPVUs in a separate rulemaking.  But DOE's final rule rejected adoption of the space-constrained SPVU class advocated by commenters and declined to then provide any additional relief for manufacturers requesting more lenient standards for such models.[17]

**D.  2022 Industrial SPVU and Related CAC Test Procedure Rulemakings**

---

[17] 80 Fed. Reg. 57,438, 57,448, 57,550–57,551 (Sept. 23, 2015); *see also* D.I. 1 ¶¶ 106–108.

In 2022, DOE revised the test procedure for industrial SPVUs.  In that rulemaking, DOE put a finer point on the existing requirements for certain small industrial SPVUs, and what distinguished them from CACs with a similar capacity range that are subject to more-stringent consumer standards. DOE did so by identifying two features of such SPVU models—weatherization and minimum ventilation—that reflected *only* commercial applications instead of personal or individual use.[18]  After identifying these distinguishing features, DOE added definitions of SPVUs with either feature to clarify that such SPVUs are not included in the CAC definition.[19]

DOE also reiterated that manufacturers had misclassified as SPVUs other model types used in individual applications such as apartment units.  DOE continued to confirm that models without certain features that are used exclusively in commercial applications are consumer CACs.  87 Fed. Reg. at 2495.  DOE specifically rejected the argument that the 2007 addition of industrial SPVU to the statute changed the existing structure of EPCA or the scope of the CAC definition, or reclassified or were intended to reclassify products that were previously covered as covered products.  *Id.* at 75,150.  The amendments only defined a particular variety of commercial equipment.  *Id.*  Likewise, DOE refuted the suggestion that the regulatory clarification that DOE was adopting for certain products reclassified any existing products, explaining DOE's goal was only "to prevent the misclassification of consumer products as industrial equipment, specifically SPVUs."  *Id.* at 75,152.[20]

---

[18] 87 Fed Reg. 2494; *id.* at 75,144, 75,148 ("Specifically, DOE preliminarily determined that weatherization, or in the case of non-weatherized units, the presence of optional air ventilation provisions, represent key design characteristics that indicate use in commercial applications.").

[19] 87 Fed. Reg. 64,550, 64,586 (Oct. 25, 2022); *id.* at 75,144, 75,167 (Dec. 7, 2022).  The definitions were specific to SPVUs with a cooling capacity less than 65,000 Btu/h.  *Id.* at 75,167–68.  That capacity is relevant because a CAC is defined as having a capacity below 65,000 Btu/h.  42 U.S.C. §§ 6291(21), (24).  Thus, equipment with a capacity of 65,000 Btu/h or more could not be a consumer CAC under the existing statutory definition.

[20] Industrial SPVUs are subject to different efficiency standards than consumer CACs.  In 2019, for example, SPVUs with a cooling capacity less than 65,000 Btu/h were subject to an energy efficiency ratio ("EER") for the cooling mode of 9 or 11, and a coefficient of performance of 3.0 or 3.3 for the heating mode, depending on the date of manufacture.  10 C.F.R. § 431.97(d)(2), (d)(3) (2019).

**E.  Friedrich Did Not Test or Certify Its Products as Consumer CACs**

Between 2019 and 2023, Friedrich manufactured and distributed in commerce consumer products that meet each technical element of the statutory definition of consumer CACs.  D.I. 1 ¶¶ 70–89.  Nevertheless, Friedrich did not test its products in accordance with the applicable test procedure for CACs.  *Id.* ¶ 92.  Friedrich did not make, maintain, or provide to DOE any data demonstrating that it tested these products in accordance with the test procedure for CACs, and Friedrich did not certify to DOE that these products complied with the energy conservation standard applicable to CACs.  *Id.* ¶¶ 90–95.  DOE accordingly initiated enforcement proceedings against Friedrich for violations of EPCA, consistent with the procedures specified in statute.  *See* 42 U.S.C. § 6303(d).  This led to the issuance of an order assessing civil penalties, which is the subject of this action.  D.I. 1 ¶¶ 96–105; *see also* D.I. 6-1 Ex. A.

Friedrich acknowledges distributing at least 103,239 units.  D.I. 6 at 11.  Based on average sales prices Friedrich provided, DOE estimates that Friedrich realized hundreds of millions of dollars in revenues from unlawful sales.  After applying its enforcement policy, DOE assessed a civil penalty of $57,813,840.  D.I. 6-1 Ex. A ¶ 24.  Once Friedrich refused to settle its violations, DOE filed its Complaint.  D.I. 1.

## V.    LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.

When reviewing DOE's administrative assessment of an EPCA civil penalty, the "court shall have authority to review de novo the law and the facts involved."  42 U.S.C. § 6303(d)(3)(B).

Nevertheless, as with any complaint, when reviewing this complaint on a Rule 12(b)(6) motion to dismiss, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A court does "not inquire whether a plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is entitled to offer evidence to support his or her claims." *Grier v. Klem*, 591 F.3d 672, 676 (3d Cir. 2010). As the moving party, Friedrich must show that the complaint pleads no facts stating a legal claim. *See Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011).

## VI.      <u>ARGUMENT</u>

The Rule 12(b)(6) Motion should be denied. The Complaint pleads plausible claims for relief under the plain text of EPCA. Specifically, Friedrich's products are "central air conditioner[s]," a "consumer product" under EPCA. 42 U.S.C. § 6291(1), (2), (21). Friedrich committed "unlawful" acts by failing to test each of its consumer CAC models under the CAC test procedure, thereby failing to record and provide information required, as well as conform to the applicable energy conservation standard. *Id.* § 6302(a)(3), (5). Friedrich likewise failed to correctly certify and report that each of its models complied with consumer CAC energy conservation standards. *Id.* § 6302(a)(3).

Friedrich seeks to dismiss DOE's Complaint in whole or part on two grounds. Both are meritless. *First*, Friedrich asserts that DOE's penalty is an attempt to enforce new regulations, erroneously insisting that in 2022 DOE retroactively reclassified its products from SPVUs to CACs. D.I. 6 at 12–18. Not true. DOE is enforcing longstanding *statutory* requirements that: [a] existed throughout the penalty period; [b] DOE repeatedly stated applied to *consumer* products such as Friedrich's, and [c] Friedrich elected, at its own peril, to ignore. *Second*, Friedrich alleges DOE lacks statutory authority to seek penalties for failure to test using the applicable test procedure. *Id.* at 13, 18–20. This argument

11

is equally lacking.  Testing in accordance with the appropriate test procedure is necessary to provide required reports and information, 42 U.S.C. § 6302(a)(3), and required for a manufacturer's products to achieve "conformity with an applicable energy conservation standard." *Id.* § 6302(a)(5).

**A. Friedrich Violated EPCA by Selling Consumer CACs Without the Required Testing and Certification**

DOE has alleged facts that demonstrate clear violations by Friedrich of EPCA's plain text. Friedrich sold consumer CACs without performing the necessary testing and certification in violation of section 6302(a).  By contrast, Friedrich's Rule 12(b)(6) motion is laden with disputed facts and misguided legal arguments.  Friedrich claims "full compliance" with inapplicable EPCA provisions and regulations, insists that it has acted in "good faith" to comply with EPCA, and asserts that it was duly complying with what "the industry ha[s] long understood" DOE's regulations to require.  D.I. 6 at 1.  Because these and other predicate facts to Friedrich's "Due Process Clause" affirmative defense are not pled in or derived from the Complaint, they are beyond the scope of a Rule 12(b)(6) motion. Moreover, Friedrich's assertion of a "retroactive" rulemaking is premised on a misinterpretation of the statute.  Friedrich's reading is facially inconsistent with the statute's text and Congress's broader statutory scheme for energy efficiency standards.

**1.  Under EPCA's Text and Structure, Friedrich's Models Are Consumer CACs**

DOE's Complaint plausibly pleads facts stating Friedrich's models at issue are, and have always been, consumer CACs under the plain text of EPCA.  To that end, Congress designated CACs as covered consumer products when it first enacted EPCA in 1975.  Pub. L. No. 94-163, 89 Stat. 917–18.  In 1987, Congress added the technical elements for a CAC that DOE pleads.  Pub. L. No. 100-12, 101 Stat. 103–04.  In 2004, DOE established a specific "space constrained" CAC definition and standards for models like Friedrich's.  69 Fed. Reg. 50,997, 50,998, 51,000 (Aug. 17, 2004); 10 C.F.R. §§ 430.2, 430.32(c) (2005).  DOE's Complaint pleads Friedrich's failure to test its products under the

12

correct test procedure and failure to certify those products conform with the CAC energy conservation standards. D.I. 1 ¶¶ 18–19, 34–49, 70, 72–89. These statutory provisions came into existence well before the beginning of the enforcement period in 2019. *See id.* ¶¶ 44–45, 47, 49.

Friedrich's "retroactivity" defense stems from a legal fallacy. Friedrich argues that DOE modified its regulations in 2022 to define Friedrich's products for the first time as consumer CACs. Now, Friedrich says, DOE is trying to enforce those recently modified regulations against it. That is not correct. DOE seeks no retroactive application of law.

*First*, Friedrich does not dispute that the Complaint pleads facts establishing that Friedrich's products have technical elements meeting Congress's longstanding definition of consumers CACs. Its retroactivity argument is instead premised on the idea that (until the 2022 revisions) its products met the definition of SPVUs, not consumer CACs. 42 U.S.C. §§ 6311(22), (23). This argument fails *on the facts* as well as the law. As a factual matter, the Complaint specifically pleads that Friedrich's products did not meet the definition of industrial SPVUs—and Friedrich knew that and violated the law anyway. D.I. 1 ¶¶ 44–45, 47, 49, 70, 72–89. Under the statute, SPVUs are a subset of "commercial package air conditioning and heating equipment." 42 U.S.C. §§ 6311(22), (23). To qualify as "commercial package air conditioning and heating equipment," one of the statutory factors required—among numerous others—is that such equipment must be "for commercial application." *Id.* § 6311(8)(A). DOE expressly alleged, and plausibly pleads facts to support, that "[t]he Friedrich Products are *not* for commercial application." D.I. 1 ¶ 83 (emphasis added); *see also id.* ¶¶ 79–82, 84–85. Friedrich cannot establish that its products qualified as industrial SPVUs instead of consumer CACs without disputing facts pled in the Complaint. This is not permissible on a motion to dismiss. *See, e.g., Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) ("When deciding a motion to dismiss . . . [t]he district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it."). This alone is reason enough for the Court to reject Friedrich's first ground to dismiss.

13

*Second*, Friedrich's assertion that its products were SPVUs also fails as a matter of law. As DOE explained in 2014—years before the period of enforcement at issue in this case—"consumer products and industrial equipment are mutually exclusive categories" under Congress's longstanding statutory scheme in EPCA. 70 Fed. Reg. at 20,122. Therefore, "[a]n appliance model can only be considered commercial/industrial equipment under EPCA if it does not fit the definition of 'consumer product.'" *Id.* The statute achieves this mutual exclusivity by expressly excluding from the definition of "industrial equipment" in Part A-1 (originally Part 3) any "covered product" that *is* regulated as a consumer product in Part A. *See* 42 U.S.C. § 6311(2)(A)(iii) ("which is not a 'covered product' as defined in section 6291(a)(2) of this title"); *see also* 42 U.S.C. §§ 6291(1), 6311(1), (2). Thus, at all relevant times, Friedrich's products are and always were CACs subject to the requirements for CACs.[21] "When interpreting statutory language, we must examine the statute as a whole, rather than considering provisions in isolation." *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 302 (3d Cir. 2011). Enforcing the CAC requirements against Friedrich's noncompliance is not retroactive application of the 2022 regulations. It is simply recognizing and enforcing the statutory structure that Congress put in place decades ago and that Friedrich knowingly chose to disregard.[22]

*Third*, even if the facts and law did not require rejection of Friedrich's theory (as they do), Friedrich's fact-laden arguments about "fair notice" and denial of "due process" based on supposed

---

[21] Friedrich chose to test and report its models as industrial SPVUs, which are subject to less stringent standards, and as a result generated revenues several times the penalty sought. D.I. 1 ¶ 4, D.I. 6-1 Ex. A ¶ 6. This was contrary to EPCA.

[22] Friedrich asserts that DOE's "complaint relies on the resulting 2022 regulations in their codified form . . . ." D.I. at 2; *see also id.* at 4. This is false. DOE's complaint nowhere relies on the *characteristics* added by the definitional changes in the 2022 rule to determine that Friedrich's products do not qualify as SPVUs. To the contrary, DOE's consistent position has been that Friedrich's products were statutory CACs for the entire time period at issue in DOE's Complaint. *See* D.I. 1 ¶¶ 72–89; D.I. 6-1 Ex. A ¶ 3, Ex. B ¶ 2. Notably, the regulatory definition for CAC (as well as for "space constrained product") has been at the same provision of the Code of Federal Regulations throughout the period of the assessed penalty. *See* 10 C.F.R. § 430.2 (2019).

"good faith," and what the "others in the industry have long understood," is beyond the scope of the Complaint and impermissible for a Rule 12(b)(6) motion to dismiss. Regardless, Friedrich's fair notice argument collapses under the weight of EPCA's plain text and statutory structure, DOE's implementing regulations in existence long before 2019, and the specific warnings that DOE's administrative actions provided to Friedrich over the years that its products are consumer CACs. DOE *repeatedly* warned that certain manufacturers were misclassifying consumer CACs as industrial SPVUs. *See* 79 Fed. Reg. at 78,627 (stating "units currently listed by manufacturers as SPVUs . . . are being misclassified and are appropriately classified as central air conditioners"), 79 Fed. Reg. at 20,123 (same). DOE also *repeatedly* explained why EPCA classifies such products as consumer CACs rather than industrial SPVUs. *See* 79 Fed. Reg. at 78,626 (stating "[a]ny product that meets the definition of 'consumer product' . . . is classified as a consumer product"); 79 Fed. Reg. at 20,122–20,123 (explaining "consumer products and industrial equipment are mutually exclusive categories," so "products [that] meet the definition of 'central air conditioner,' . . . are appropriately categorized as consumer products under the statute."). And Friedrich does not, and cannot, point to anything in the rulemaking history where DOE identified Friedrich's products as industrial SPVUs rather than consumer CACs. "The [fair notice] standards are especially lax for civil statutes that regulate economic activities." *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015). On this Rule 12(b)(6) motion, accepting the facts pled by DOE, Friedrich cannot establish its affirmative defense as a matter of law.

### 2. DOE Did Not Reclassify SPVUs as CACs in the December 2022 Rule

Friedrich's motion persistently mischaracterizes DOE's modification of the industrial equipment definitions in the December 2022 rule. DOE made these modifications in conjunction with a modification of its industrial test procedures for SPVUs. But Friedrich's argument about these regulations is just smoke and mirrors. Those 2022 regulatory changes did nothing to reclassify Friedrich's products as CACs or affect the law that DOE relies upon to plead the Complaint.

15

DOE was explicit in the final industrial testing rule of 2022: "The new definitions do not reclassify any products; DOE has concluded that any products not meeting the definition finalized by this rule should have previously been properly classified, and would continue to be classified, as consumer products . . . ." 87 Fed. Reg. at 75,151–75,152. This refutes Friedrich's assertion of retroactive application of a new regulatory framework. As DOE explained in that rulemaking, the definitions DOE adopted to differentiate a narrow subset of SPVUs only put a finer point on the existing requirements. This clarified for manufacturers that certain small, single-package vertical air conditioner products were *not* consumer CACs subject to regulation under those more-stringent efficiency standards. DOE "determined that weatherization, or in the case of non-weatherized units, the presence of optional air ventilation provisions, represent key design characteristics that indicate use in commercial applications," not individual use or consumption. *Id.* at 75,148. To this end, DOE's 2022 rules clarified a "*Single-phase single package vertical air conditioner with cooling capacity less than 65,000 Btu/h*"—but only with certain commercial-only features like weatherization or certain optional air provisions of at least 400 cubic feet per minute—are not consumer CACs but a form of industrial SPVU. *Id.* at 75,167 (revising 10 C.F.R. § 431.92); *id.* at 64,550, 64,586. Friedrich does not contend its consumer CAC products sold from 2019 to 2023 had these commercial-only features. Even if Friedrich did, that would be a factual question, not suitable for resolution in the context of their motion to dismiss.

The motion portrays paragraph 78 of the Complaint as reflecting DOE's reliance on changes from the 2022 rules. D.I. 6 at 17. DOE makes no such reliance. Rather, the facts pled in that paragraph establish that Friedrich's products *are* consumer products under 42 U.S.C. § 6291(1). These facts establish that Friedrich's products are "of a type" "which, to any significant extent, [are] distributed in commerce for personal use or consumption by individuals." *Id.*

16

Thus, the definitional changes to SPVUs in the 2022 rules have nothing to do with Friedrich's products at issue.  Nor are they the basis of DOE's enforcement action here.  Friedrich's assertion of retroactivity is entirely without merit.  Its Motion should be denied.

### B.  DOE Has Statutory Authority to Impose Penalties for Failure to Test

Friedrich also argues that Count I of DOE's Complaint should be dismissed, saying DOE "lacks statutory authority to impose any sanction for a manufacturer's failure to test its product pursuant to DOE requirements."  D.I. 6 at 18.  This argument again relies on ignoring the plain text of EPCA.  EPCA explicitly authorizes DOE to impose penalties for, among other actions, a failure to "permit access to . . . records . . . or provide other information required . . . ."  42 U.S.C. § 6302(a)(3).  And test data—which is required for EPCA compliance—can be accessed and provided *only if* a manufacturer has fulfilled its obligation to *test* its products in conformance with the applicable test procedure to confirm compliance with the applicable energy conservation standard.  Similarly, section 6302(a)(5) prohibits a manufacturer from distributing in commerce a new covered product not in conformity with an applicable energy conservation standard.  Conformance with those standards *requires* testing in accordance with the applicable test procedure.  42 U.S.C. § 6295(s).  Friedrich does not, and could not in a motion to dismiss, dispute DOE's assertion that Friedrich did not test its products pursuant to the test procedure for consumer CACs, *see* D.I. 1 ¶¶ 92–93, 121–22.  That failure to test under consumer CAC standards establishes that Friedrich distributed new covered products in commerce which were not in conformity with the applicable consumer CAC energy conservation standards, as well.  42 U.S.C. § 6302(a)(5).

Friedrich's argument that DOE lacks authority to assess penalties for failure to test boils down to noting that section 6302 does not explicitly use the words "failure to test."  *See* D.I. 6 at 18–19.  But this argument impermissibly ignores the textual breadth of the prohibited acts that Congress made "unlawful" in section 6302(a).  Manufacturer testing is central to the operation of the energy

conservation programs established by Congress in EPCA. For example, correct testing is fundamental to a manufacturer's ability to accurately "make reports or provide other information required to be supplied under this part." 42 U.S.C. § 6302(a)(3). A manufacturer cannot make any representation in writing or broadcast with respect to the energy efficiency or energy use of a product "unless such product has been tested in accordance with such test procedure . . . ." 42 U.S.C. § 6293(c). Mandatory labels on products also must report the estimated annual operating cost of the product "determined in accordance with the test procedures prescribed . . . ." *Id.* § 6294(c)(1)(A). And manufacturers must provide test data within 30 days of a request to do so, and they must retain that data until two years after notifying DOE that the model has been discontinued. *Id.* § 6296(b)(2); 10 C.F.R. § 429.71(c). As prohibited by EPCA, a manufacturer is acting "unlawful[ly]" and "fail[ing] to permit access to, or copying of, records required to be supplied" and "provide other information required to be supplied under this part" if a manufacturer is failing to test and generate statutorily required records using the correct EPCA-required test procedures. *See* 42 U.S.C. § 6302(a)(3). To be sure, a manufacturer could violate this provision of EPCA in other ways, such as destroying correctly gathered test data that is required to be preserved. *See* 42 U.S.C. §§ 6296(b)(2), 6302(a)(3). But a failure to perform the required testing necessary to generate this required data is logically no less a violation of EPCA than destroying any data resulting from such required tests.

In addition, section 6302(a)(5) prohibits a manufacturer from distributing in commerce a new covered product "which is not in conformity with an applicable energy conservation standard established in or prescribed under this part." As this paragraph reflects, correct application of the applicable test procedure is essential to such "conformity." Conformity with energy conservation standards is determined "using the test procedures . . . prescribed . . ." by EPCA and DOE. *Id.* § 6295(s); *see also id.* § 6291(4), (5), (6) (defining the terms "energy use," "energy efficiency," and "energy conservation standard" by reference to "test procedures under section 6293"). In other words, the only way in

18

which a manufacturer's product can ever be in "conformance" with an applicable energy conservation standard is through testing of the product in accordance with the correct test procedure. 42 U.S.C. §§ 6295(s) ("*Compliance with* . . . the energy conservation standards . . . *shall be determined using the test procedures* and corresponding compliance criteria prescribed under section 6293 of this title.") (emphasis added). If a manufacturer has failed to test a product in accordance with the correct test procedure, the manufacturer *necessarily* is not in "conformance with an applicable energy conservation standard" and by then distributing that product thereby commits an "unlawful" prohibited act described in section 6302(a)(5).

Beyond these statutory violations, Congress expressly delegated to DOE the authority to supplement by regulation the substantive minimum requirements of the statute. *See, e.g.*, 42 U.S.C. §§ 6293(a) (referring to test procedures "prescribed . . . by the Secretary"), 6295(o)(2) (describing criteria for any new or amended energy conservation standard "prescribed by the Secretary"). EPCA delegates to the Secretary authority to prescribe additional requirements to ensure proper implementation of the energy conservation programs under EPCA. This includes both general provisions, *see* 42 U.S.C. § 6298 ("The . . . Secretary may . . . issue such rules as [he] deems necessary to carry out the provisions of this part."), and more specific provisions, *see id.* § 6295(r) ("Any new or amended energy conservation standard . . . shall include . . . test procedures . . . *and may include any requirement* which the Secretary determines is necessary to assure that each covered product to which a standard applies meets the minimum level of energy efficiency or maximum quantity of energy use specified in such standard.") (emphasis added). After exercising this power, DOE has specified since 2011 that failure to test a covered product in conformance with the applicable test procedure is a prohibited act. 10 C.F.R. § 429.102(a)(2) (2012). Importantly, in referring to the list of prohibited acts for which DOE is authorized to impose civil penalties, Congress itself described section 6302(a)(3) as the "*requirements prescribed by the Secretary*." 42 U.S.C. § 6303(a) (emphasis added). Thus, rather than endorse

19

the constrained reading proffered by Friedrich, the broader statutory context confirms Congress's view of the list of prohibited acts in EPCA as a set of minimum requirements that the Secretary could further develop by regulation. DOE did so. Failure to test is now an expressly prohibited act under those regulations. 10 C.F.R. § 429.102(a)(2). Friedrich's contrary argument fails.

While Friedrich does not dispute DOE's authority to pursue penalties for Count II, it nevertheless strains to bootstrap a dismissal of Count II to the purported absence of statutory authority for Count I. Friedrich suggests that—even though DOE alleges two distinct counts—the computation of the assessed penalty is somehow flawed because DOE did not expressly apportion the penalty across the separate counts. *See* D.I. 6 at 20. Even if there were some validity to that argument, it is not a basis to dismiss DOE's Complaint as a whole. On a motion to dismiss, "it need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985); *see also* 42 U.S.C. § 6303(a) (authorizing penalties for violations of EPCA's prohibited acts). DOE's final order assessing penalties cited *both* Friedrich's failure to test *and* Friedrich's failure to properly certify, D.I. 6-1 Ex. A ¶¶ 13, 16, as does the Complaint, D.I. 1 ¶¶ 118–29. And, by Friedrich's own admission, failure to certify alone carries a maximum penalty of over $9 million. D.I. 6 at 20. A "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). Friedrich's factual debate about what penalty amount may or may not be applicable just to Count II of DOE's notice-pleading Complaint is—once again—an impermissible basis to dismiss on a Rule 12(b)(6) motion.

## VII.    CONCLUSION

Friedrich's fact-based, atextual arguments for dismissal are without merit. The Motion to Dismiss should be denied.

20

Respectfully submitted,

JONATHAN BRIGHTBILL
General Counsel

LUCY LEE
Acting Assistant General Counsel

DAVID CASE
Deputy Assistant General Counsel

NICHOLAS D. GRAY
Trial Attorney

/s/ Christina Studt
CHRISTINA STUDT
Trial Attorney
United States Department of Energy
1000 Independence Ave. SW (GC-32)
Washington, DC 20585
(240) 252-8535
christina.studt@hq.doe.gov

BENJAMIN L. WALLACE
United States Attorney

/s/ Dylan J. Steinberg
DYLAN J. STEINBERG
Chief, Civil Division
Assistant United States Attorney
District of Delaware
1313 N. Market St.
Wilmington, DE 19081
(302) 225-9440
dylan.steinberg@usdoj.gov

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Dated: April 24, 2026                    *Attorneys for Plaintiff*

21